Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Thrivify, LLC**, dba The Lodge in Sisters, LLC, | Case No. 23-30538-dwh11 |
| Debtor. | |
| **Revivify, LLC**, a Colorado limited liability company, et al., | Adv. Pro. No. 23-03027-dwh |
| Plaintiffs, | MEMORANDUM DECISION DENYING MOTIONS FOR SUMMARY JUDGMENT[1] |
| v. | |
| **Thrivify LLC**, an Oregon limited liability company, et al., | |
| Defendants. | |

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

## I.    Introduction

Seven of nine defendants have moved for summary judgment. Movants have not shown that there are any unsatisfied conditions to formation of the parties' settlement term sheet as a contract or that unsatisfied closing conditions cannot be satisfied. I will deny the summary-judgment motions.

## II.    Background

This action addresses whether claims among the direct or indirect member-owners of debtor, Thrivify, LLC, were settled before it filed its petition initiating the main case to which this action relates. The five limited liability company members of Thrivify are Revivify, LLC; Retrac, LLC; TDLS, LLC; Thrive 1967, LLC; and Thrive 1969, LLC. Retrac is controlled by Jeff Carter; Revivify is controlled by Mark and Anita Adolf; Thrive 1967 is controlled by Sean Adrian Blackburn; and Thrive 1969 is controlled by Terence Christian (Chris) Blackburn. Because the Blackburns share a last name, I will refer to them individually as Chris and Sean.

In this action, plaintiffs are the Adolfs, Carter, Retrac, and Revivify. Defendants are the Blackburns; Clutch Industries, Inc.; SAK Oregon, LLC; Steelhead Properties, LLC; TDLS; Thrive 1967; Thrive 1969; and Thrivify. Clutch and Steelhead are controlled by the Blackburns. SAK is the state-court receiver for Thrivify.

Plaintiffs claim that the five Thrivify members entered into an enforceable term sheet for a settlement in which Retrac and Revivify would sell their

interests to Thrive 1967 and Thrive 1969 (the Thrive LLCs). Other term-sheet signers are Clutch, SAK, TDLS, and Thrivify. The complaint seeks declaratory judgment,[2] breach of contract,[3] specific performance,[4] and reformation.[5]

The Blackburns and Steelhead have filed a summary-judgment motion, including a brief and three declarations, contesting the term -sheet's enforceability.[6] When I refer below to "movants," I mean the Blackburns and Steelhead. When I refer to "the motion," without referring to a motion number, I mean the Blackburn/Steelhead motion. Clutch and the Thrive LLCs have filed a summary-judgment motion essentially identical to, and incorporating, the motion.[7] And TDLS has filed a joinder in the motion.[8]

Plaintiffs have opposed the motion.[9] SAK and Thrivify have taken no position.

## III.    Undisputed facts

Greater Nevada Credit Union (GNCU) lent $10 million to Thrivify and The Lodge in Sisters, LLC.[10] The GNCU loan agreement defines

---

[2] ECF No. 1 at 43–44 ¶¶ 180–83.
[3] ECF No. 1 at 44–47 ¶¶ 184–99.
[4] ECF No. 1 at 47–48 ¶¶ 200–03.
[5] ECF No. 1 at 48–51 ¶¶ 204–20.
[6] ECF No. 33.
[7] ECF No. 35.
[8] ECF No. 34.
[9] ECF No. 46.
[10] ECF No. 33 Declaration of Wesley Hill (Hill decl.) at 2 ¶ 2, Ex. 1.

"Guarantors" as the Adolfs and three nonparties[11] and "Loan Documents" to include the loan agreement and guaranties.[12] Under the loan agreement, no modification or waiver of any provision or any consent to any departure by borrowers or guarantors from any loan document will be effective unless it is in writing signed by GNCU, borrowers, and guarantors.[13] GNCU has conveyed interests in the loan to an investor and three participants.[14]

A Partner Buyout and Settlement Term Sheet was signed on October 13 and 14, 2022.[15] In paragraph 1, the Thrive LLCs agree to buy all Thrivify membership interests from Retrac and Revivify. Paragraphs 2 and 3 set forth the agreed prices, the installment terms, and the security for the unpaid prices. In paragraph 4, the parties agree that the Thrive LLCs would wire funds to Santiam Escrow. If "final documents are not agreed to by the parties by October 31, 2022, the wire transfers will be released to" the Thrive LLCs.[16] In paragraph 7, they agree that "GNCU must facilitate substituting Terence C. Blackburn in as the sole guarantor of that existing promissory note and will remove all current guarantors from that promissory note with no changes in the loan terms and interest rate." They acknowledge later in

---

[11] ECF No. 33 Hill decl. at 2 ¶ 2, Ex. 1 at 3 § 1.25.
[12] ECF No. 33 Hill decl. at 2 ¶ 2, Ex. 1 at 4 § 1.30.
[13] ECF No. 33 Hill decl. at 2 ¶ 2, Ex. 1 at 7 § 8.3.
[14] ECF No. 33 Hill decl. at 5 ¶ 10, Ex. 10 at 2; ECF No. 46 Pahl decl. at 3, Ex. 13 at 7.
[15] ECF No. 33 Hill decl. at 4 ¶ 4, Ex. 4; ECF No. 46 at 3, Declaration of Douglas Pahl (Pahl decl.) at 2 ¶ 2, Ex. 1.
[16] ECF No. 33 Hill decl. at 3 ¶ 4, Ex. 4 at 2 ¶ 4.

the same paragraph that "GNCU will not be a signatory to this Agreement but has indicated a willingness to consider the substitution of guarantors, contingent upon its review of the parties' financial information."[17] Paragraph 8 makes the settlement "contingent upon GNCU approval of substituting Terence C. Blackburn as sole guarantor" of the loan.[18]

A term-sheet amendment was signed on October 30 and 31, 2022.[19] The amendment changed the October 31, 2022, date to November 30, 2022.[20]

Eric Astrup is the GNCU loan servicer.[21] In a November 14, 2022, email, he requested concurrence of the investor and participants to "the request to change the ownership of the borrower and the guarantors for the loan," which "has been approved by Greater Nevada Credit Union."[22]

After November 30, Santiam Escrow released the escrowed funds to the Thrive LLCs.[23]

## IV.    Analysis

The Blackburns and Steelhead seek summary judgment or partial summary judgment that nine statements, which they call motions, are true. When I refer below to "motions" or any motion with a motion number, I mean

---

[17] ECF No. 33 Hill decl. at 3 ¶ 4, Ex. 4 at 2 ¶ 7.
[18] ECF No. 33 Hill decl. at 3 ¶ 4, Ex. 4 at 3 ¶ 8.
[19] ECF No. 33 Hill decl. at 3 ¶ 5, Ex. 5; ECF No. 46 Declaration of Mark Adolf (Adolf decl.) at 10 ¶ 35, Ex. 10.
[20] ECF No. 33 Hill decl. at 3 ¶ 5, Ex. 5.
[21] ECF No. 33 Hansen decl. at 2 ¶ 1; ECF No. 52 at 10.
[22] ECF No. 33 Hill decl. at 5 ¶ 10, Ex. 10 at 21, 22, 24, 29.
[23] ECF No. 1 ¶¶ 85-87; ECF No. 33 Hill decl. at 5 ¶ 8, Declaration of Terence C. Blackburn at 3 ¶ 6.

those nine motions. When I mean to refer to the separately filed summary-judgment motions, I refer to them as the "summary-judgment motions."

I take movants to ask for rulings on their nine motions. Although movants don't discuss the motions separately after listing them at the beginning of their brief, I will do so because they raise distinct points of law. I will consider movants' arguments as they relate to the motions.

When a federal court determines which state's law applies to an issue governed by state law, it must apply the choice-of-law rules of the forum state.[24] Because this court sits in Oregon, it applies Oregon's choice-of-law rules.[25] Here, no party has argued that, under Oregon's choice-of-law rules, the law of a state other than Oregon governs the issues raised by the motions.

Federal Rule of Civil Procedure 56(a) requires the court to grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. It is at least implicit in that rule that the court cannot grant summary judgment if either there is a genuine dispute as to a material fact or the movant is not entitled to judgment as a matter of law.

---

[24] Kohlrautz v. Oilmen Participation Corp., 441 F.3d 827, 833 (9th Cir. 2006).
[25] Or. Rev. Stat. §§ 15.300–.380.

### A. Motion 1: GNCU's approval

Motion 1 asks for a ruling that "[a] contingency to the existence of an enforceable settlement – GNCU approval and facilitation of modifications to the GNCU Loan Documents, including the guaranties – did not occur prior to the November 30, 2022 deadline."[26]

### 1. The term sheet constitutes a formed contract.

Motion 1 turns on the distinction between what plaintiffs call "contingencies to formation" and "closing conditions."[27] Oregon appellate courts have recognized that distinction, using similar terminology. In 1934, the Oregon Supreme Court recognized that "conditions may relate to the formation of contracts or to liability under them. . . . The fact that no liability on either side can arise until the happening of a condition does not . . . make the validity of the contract depend upon its happening."[28] In 1988, the Oregon Court of Appeals addressed an earnest-money agreement provision making a land sale subject to receiving governmental approvals "concerning buildability." The buildability requirement, which had not been satisfied, was held not to be "a condition precedent to contract *formation*," but to be "only a condition precedent to *performance*."[29] And in 2015, that court addressed a dispute over the enforceability of an agreement that a mutual release would

---

[26] ECF No. 33 at 2.
[27] ECF No. 46 at 3.
[28] Hoffman v. Employer's Liab. Assur. Corp., 29 P.2d 557, 560 (Or. 1934), quoting 2 Williston on Contracts § 666.
[29] Honeyman v. Clostermann, 753 P.2d 1384, 1388 (Or. App. 1988) (emphasis in original).

Page 7 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

"not be effective until all the parties have signed it." It held that "[t]he *contract* between the parties was achieved when they reached an accord on the dollar amount and *the fact that a release would be executed*. Thus, the signing of the release was a condition precedent to the performance of the contract, not to the formation of the contract."[30]

In motion 1 (as well as motions 3, 5, 6, and 9), movants argue that the term sheet is not "an enforceable settlement," by which I take them to mean that unsatisfied contingencies prevented contract formation. Plaintiffs argue (with the exception addressed in part IV.A.1 above) that the unsatisfied contingencies are instead "closing conditions"—conditions precedent to performance—and that the existence of unsatisfied closing conditions does not make the term sheet unenforceable.

Movants do not dispute that GNCU, through Astrup, said that GNCU had approved the swap, and they offer no evidence that the approval did not occur. They do argue that the approval of GNCU alone was ineffective because (1) approval "required further approvals/concurrences from third-party investors and participants in the GNCU Loan,"[31] and (2) the approval was not "in a writing signed by GNCU, the Borrower, and/or the Guarantors."[32]

---

[30] Bridge City Fam. Med. Clinic, P.C. v. Kent & Johnson, LLP, 346 P.3d 658, 664 (Or. App. 2015) (emphasis in original).
[31] ECF No. 52 at 11. *See also* ECF No. 33 at 9.
[32] ECF No. 52 at 12. *See also* ECF No. 33 at 10.

The term sheet requires that GNCU "facilitate" the swap, and in a separate paragraph, it makes the settlement "contingent upon GNCU approval of" the guarantor swap. For the sake of argument, I will assume that "facilitate" here means "accomplish" or "cause to happen." Plaintiffs call the facilitation requirement a closing condition. They also say that the GNCU approval requirement is the "one contingency" to which "formation of the settlement contract" (the term sheet) was subject[33]–but they argue that the contingency was satisfied by GNCU's November 14, 2022, swap approval.

Movants argue that GNCU's approval cannot occur without the third-party approvals and the formality required by the loan agreement. Plaintiffs disagree, arguing that facilitation is a closing condition but not a contingency to contract formation.

GNCU's approval is a necessary but insufficient first step toward swap facilitation. Plaintiffs don't dispute that facilitation will, at least as a practical matter, require the third-party approvals and GNCU's formal approval of the ownership change, release of the existing guaranties, and acceptance of the new guaranty. To treat the approval and facilitation requirements as indistinguishable would ignore the parties' drafting choice to state those requirements separately and in different paragraphs—as well as their choice to use the term "contingency" only to describe the approval requirement.

_____

[33] ECF No. 46 at 3.

There is no dispute that swap approval by GNCU (though alone), as the first step of facilitation, did occur. Thus, if approval was a contingency to contract formation, it has been satisfied.

   2.   **The language of the term sheet does not make it unenforceable because GNCU's swap approval and facilitation had not occurred by November 30, 2022.**

Motions 1 through 4 refer to a "November 30, 2022 deadline" by which GNCU's approval and facilitation of the modifications supposedly had to occur. The only reference to this date is in the term-sheet amendment, which inserts that date in place of October 31, the date that appears in the original term sheet. But nothing in the term sheet or its amendment says that either date was a deadline for GNCU's approval or facilitation of the required modifications.

The term sheet does say that if the parties did not agree on "final documents" by October 31 (later changed to November 30), 2022), wire transfers would be released to the Thrive LLCs. The referenced "final documents" are those to be "prepared and signed by the parties" to the term sheet. The term-sheet amendment refers to a deadline "to agree on final documents for the partner buyout and settlement."[34] On its face, this language says nothing about GNCU's approval or facilitation of the guaranty swap. Movants do not argue that the documents by which GNCU would

---

[34] ECF No. 33 Hill decl. at 3 ¶ 5, Ex. 5 at 1.

approve or facilitate the swap would be "prepared . . . by the parties," rather than GNCU, which is not a party.

Even if the GNCU facilitation documents are among the "final documents" referenced in the term sheet, nothing in the term sheet says that a delay in the preparation of those documents would destroy the agreement. As plaintiffs point out, the term sheet says only that the delay would cause the escrowed wire transfers to be released to the Thrive LLCs.

In fairness to movants, it would not be absurd to infer from the provision releasing the wire transfers from escrow that the parties intend that the term sheet terminate completely if the "final documents" were not agreed to by November 30. A provision calling for the purchase money to be returned to the payor might imply an intent to terminate on the entire transaction. Whether movants may introduce at trial extrinsic evidence to support that implication is something that need not be considered at this stage. For now, the failure of the final documents to be complete by November 30 is not stated on the face of the contract to result in the contract's termination.

The full swap facilitation is a closing condition, and movants point to no evidence that it cannot occur, so its nonoccurrence—and the nonoccurrence of every other closing condition—is not a ground for summary judgment.

I will deny motion 1.

### B.      *Motion 2: Form of GNCU's approval*

Motion 2 asks for a ruling that—

> Even if GNCU had timely approved and facilitated the modifications to the GNCU Loan Documents prior November 30, 2022 deadline, such approval was ineffective because neither the consent to such approval, nor amended GNCU Loan Documents, were in the form required by the GNCU Loan Documents.[35]

Motion 2 restates the portion of motion 1 asking for a determination that GNCU's swap approval could not have occurred without the third-party approvals and the approval formality required by the loan agreement.

I will deny motion 2.

### C.    Motion 3: USDA consent

Motion 3 asks for a ruling that "[a] separate contingency to the existence of an enforceable settlement – USDA and [*sic*] approval of modifications to the GNCU Loan Documents, including the guaranties – did not occur prior to the November 30, 2022 deadline."[36]

As with approvals by GNCU's loan investor and participants, USDA's approval is a closing condition, and movants have pointed to no evidence that it cannot occur.

I will deny motion 3.

### D.    Motion 4: Form of USDA consent

Motion 4 asks for a ruling that—

> Even if the USDA had timely approved the modifications to the GNCU Loan Documents prior to the November 30, 2022 deadline, such approval was ineffective because neither the

---

[35] ECF No. 33 at 2.
[36] ECF No. 33 at 2.

consent to such approval, nor amended GNCU Loan Documents, were in the form required by the GNCU Loan Documents.[37]

Because no one argues that USDA has approved the modifications, there is no need to address this hypothetical situation. I will deny motion 4.

### E.    *Motion 5: Agreement on final documents*

Motion 5 asks for a ruling that "[a] separate contingency to the existence of an enforceable settlement – the parties' agreement on multiple categories of 'final documents' – never occurred."[38]

Plaintiffs do not dispute that agreement on the final documents has not yet occurred. The parties' agreement on the final documents is not a condition to formation of the term sheet as a contract. Rather, it is a condition to the parties' obligation to perform their remaining term-sheet obligations—a closing condition.

After contracting parties enter into an agreement that is "sufficiently definite, certain and complete to make [it] specifically enforceable," leaving additional terms to be negotiated, "the law will recognize a requirement that these further negotiations must be conducted in good faith by both parties."[39] If parties "agree on the essential terms of a contract," their failure to agree in the remaining terms "does not prevent a court from enforcing the parties' agreement."[40] That "additional documents needed to be finalized [is] not a bar

---

[37] ECF No. 33 at 2–3.
[38] ECF No. 33 at 3.
[39] Van v. Fox, 564 P.2d 695, 701 (Or. 1977).
[40] Hughes v. Misar, 76 P.3d 111, 116 (Or. App. 2003).

Page 13 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

to the existence of a binding contract but, rather, a term of the contract in the sense that the parties had agreed to create the documents."[41] Every contract includes "an implied covenant that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists a covenant of good faith and fair dealing."[42]

Here, the term sheet specifies essential terms of the transaction: the membership interests to be sold, the prices and payment terms, the security for the unpaid prices, the guarantor swap, and required releases. Those terms are like those the Oregon Court of Appeals held to be essential in a land-sale contract: "the designation of the parties, the identification of the property, the promise to sell and buy, the purchase price and how it will be paid, and a fixed time and place for the delivery of the deed or "closing.""[43]

Movants argue only that the parties have not yet agreed on the final documents. Agreement on the final documents is a closing condition, and movants point to no evidence that agreement cannot occur.

I will deny motion 5.

---

[41] Dalton v. Robert Jahn Corp., 146 P.3d 399, 407 (Or. App. 2006).
[42] Perkins v. Standard Oil Co., 383 P.2d 107, 112 (Or. 1963) (en banc), quoting 3 Corbin on Contracts § 278.
[43] Povey v. Clow, 934 P.2d 528, 530 (Or. App. 1997).

Page 14 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

### F.    Motion 6: SAK

Motion 6 asks for a ruling that "[a] separate contingency to the existence of an enforceable settlement – an agreement on the amount of SAK's fees to be paid by Terence Blackburn and the related payment terms – never occurred."[44]

It's undisputed that the SAK agreement has not—yet—occurred. But the argument that reaching that agreement is a "contingency to the existence of an enforceable contract" has no support in the term sheet. The only mention of SAK's fees in the term sheet is this:

> The Settlement Agreement [that is, the later agreement that the parties expected to prepare as one of the final documents] will also provide for a payment plan with SAK Oregon, LLC and it's [sic] counsel for a stated amount and payment of its fees and those of various counsel by Terence C. Blackburn, which payment plan will be agreed to by Terence C. Blackburn, SAK Oregon, LLC and its various counsel.[45]

So it's true that the term sheet contemplates that a later agreement would be reached regarding Chris's payment to SAK. But the term sheet does not treat that later agreement as a condition to contract formation. Rather, the preparation and execution of that later agreement is a closing condition.

Movants cite the Oregon Supreme Court's 1973 decision in *Phillips v. Johnson*[46] for the proposition that "if any portion of the contract is not agreed upon or if no method is agreed upon by which such a term or provision can be

---

[44] ECF No. 33 at 3.
[45] ECF No. 33 Hill decl. at 3 ¶ 4, Ex. 4 at 3 ¶ 8.
[46] 266 Or. 544, 555 (1973).

Page 15 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

settled, there is no contract." Here, the parties agree that the settlement agreement will provide for a plan for Chris's payment to SAK. Movants argue only that Chris and SAK have not yet reached agreement. Agreement between Chris and SAK is a closing condition, and movants point to no evidence that agreement cannot occur.

I will deny motion 6.

### G. Motion 7: Statute of frauds

Motion 7 asks for a ruling that "Plaintiffs' alleged settlement is barred by Oregon's statute of frauds."[47]

Movants invoke two provisions of Oregon Revised Statutes § 41.580(1), which declare void two types of agreements unless they are written and "subscribed" (signed) by the party to be charged.

#### 1. Chris signed the term sheet.

First, movants point to 41.580(1)(b), which addresses an agreement "to answer for the debt . . . of another."[48] They argue that the term sheet is an agreement by Chris to guarantee Thrivify's debt to GNCU and that he cannot be bound because he did not sign "in his individual capacity."[49]

Literally speaking, Chris did "subscribe" the term sheet–he signed twice— as representative of both Thrive 1969 and Clutch Industries.[50] Because the

---

[47] ECF No. 33 at 3.
[48] Or. Rev. Stat. § 41.580(1)(b).
[49] ECF No. 33 at 18.
[50] ECF No. 1 at 56.

term sheet imposes obligations on him personally to become the sole GNCU guarantor, his two signatures show his willingness to be bound personally.

That understanding of the effect of Chris's term-sheet signatures aligns with appellate decisions by courts in other states (though not Oregon). In *Robert C. Malt & Co. v. Carpet World Distributors, Inc.*, a 2000 decision of the Florida Court of Appeals, the court addressed a lease to a corporate lessee, which the lessee's president signed only on behalf of the lessee, even though a lease provision made the president a guarantor. The court held that the guaranty could be enforced against the president because "[p]personal liability may . . . be imposed . . . where the contract contains language indicating personal liability or the assumption of personal obligations, despite a signature preceded by a corporate name and the word 'by' and followed by *description personae*," language identifying the signer as a corporate officer or something similar. To conclude otherwise "would nullify the specific language" of the lease imposing the guaranty.[51] Similar decisions have been issued by appellate courts in Georgia,[52] Iowa,[53] Minnesota,[54] and

---

[51] 763 So.2d 508, 509–11 (Fla. App. 4th Dist. 2000).
[52] Grot v. Cap. One Bank (USA), N.A., 732 S.E.2d 305, 311 (Ga. App. 2012).
[53] Builders Kitchen and Supply Co. v. Moyer, 2009 WL 2951295, at *1, 3–4 (Iowa App. Sep. 2, 2009).
[54] B.J. Johnson Partners, LLC v. Koss Paint & Wallpaper, Inc., 2009 WL 911012, at *4 (Minn. App. Apr. 7, 2009).

Tennessee.[55] And the facts of *Robert C. Malt* were adopted as an illustration to a comment to a provision of the Restatement (Third) of Agency.[56]

If the terms sheet includes Chris's agreement to answer for the debt of another, his two signatures on it satisfy the statute of frauds.

## 2. GNCU and USDA are not parties to the term sheet.

The second provision on which movants rely, 41.580(1)(h), renders void "[a]n agreement, promise or commitment to . . . to modify or amend the terms under which the person has lent money or otherwise extended credit, to release any guarantor or cosigner or to make any other financial accommodation pertaining to an existing debt or other extension of credit" if not signed by the party to be charged.[57] Movants point to the absence of term-sheet signatures by GNCU and USDA.

GNCU and USDA are not parties to the term sheet, and it does not and cannot impose any duties on them. It does not even mention USDA. Although GNCU is mentioned, the term sheet expressly says that GNCU is not a party. The term sheet does not purport to require (and could not require) GNCU to do anything it does not want to do.

---

[55] 84 Lumber Co. v. Smith, 356 S.W.3d 380, 382 (Tenn. 2011).
[56] Restatement (Third) of Agency § 6.01 (Am. L. Inst. 2006) cmt. d(2), illust. 14.
[57] Or. Rev. Stat. § 41.580(1)(h).

Page 18 – MEMORANDUM DECISION DENYING MOTIONS FOR etc.

GNCU and USDA are not "parties to be charged" under the term sheet, so the absence of their signatures does not affect the term sheet's enforceability among its parties.

### 3. That final documents have not been signed does not make the term sheet unenforceable.

In their reply brief, movants make a different argument about the statute of frauds: that the draft final documents attached to plaintiffs' complaint are not signed by any of movants and so cannot bind them under the statute of frauds.[58]

This argument is best understood not as that the term sheet is unenforceable under the statute of frauds, but that the draft final documents simply are not binding because movants have not agreed to their terms. Plaintiffs' position is not that the draft documents in and of themselves can be enforced against movants. Rather, they argue that those documents reflect the terms that should be interpolated into the parties' contract to give effect to their existing agreement, reflected in the term sheet. This issue was not included in the motions and was raised for the first time on reply. I therefore will not consider it now. It remains open for trial.

I will deny motion 7.

---

[58] ECF No. 52 at 15.

### H. Motion 8: Binding effect on nonsigners

Motion 8 asks for a ruling that "[p]plaintiffs' alleged settlement purports to bind persons who never signed the alleged settlement and/or are not parties to this case."[59]

Motion 8 argues that the term sheet impermissibly imposes obligations on Chris, the Adolf's, and GNCU.[60] I decided in part IV.G.1 above that Chris bound himself to the term sheet, despite signing it in a representative capacity. The same is true for the Adolfs. GNCU did not sign, but the term sheet expressly states that it is not a party, and the term sheet does not purport to impose on obligations on GNCU.

I will deny motion 8.

### I. Motion 9: Binding effect of term sheet

Motion 9 asks for a ruling that "[t]here was never a binding and/or enforceable settlement because the Term Sheet Plaintiffs seek to enforce was, on its face, never intended to be binding."[61]

Besides restating other arguments about supposed conditions precedent, motion 9 raises one new argument: that the term sheet is only a "proposed" agreement and thus does not reflect actual agreement.

The first of the two sentences in the term sheet's opening paragraph calls it a term sheet for a "proposed and stipulated settlement agreement." Except

---

[59] ECF No. 33 at 3.
[60] ECF No. 33 at 18–19.
[61] ECF No. 33 at 3.

for the word "proposed," everything in the term sheet describes an actual, not just a proposed, agreement. Even the second sentence of the opening paragraph says, "The parties agree as follows[.]" The term sheet does not use language that parties sometimes use when seeking expressly not to be bound—such as stating that certain matters in a letter of intent "do not constitute a binding agreement between the parties with respect to the proposed transaction," which the parties used in the *Buckman v. Quantum Energy Partners IV, LP*,[62] an Oregon district court decision movants cited. And the rest of the term sheet discusses what the parties "will" do, without any apparent tentativeness.

Given the context in which the term sheet was made–a settlement of pending litigation–the word "proposed" may reflect the parties' awareness that the litigation would not actually end until further steps had been taken– an interpretation bolstered by the otherwise incongruous word "stipulated" in the same passage. In any event, it does not mean that—on its face—the term sheet is something less than an agreement. Movants have not (yet) attempted to introduce extrinsic evidence that would support that interpretation.

### J.    Proof standard

Movants argue that plaintiffs' claims for specific performance and reformation require proof by clear and convincing evidence.[63] The U.S.

---

[62] No. 07-cv-1471-BR, 2009 WL 4825914, at *2 (D. Or. Dec. 8, 2009).
[63] ECF No. 33 at 7–8.

Supreme Court has held, at least in determining in a public figure's libel action in which the trier of fact must determine whether the defendant acted with actual malice, the "clear-and-convincing evidence standard should be taken into account in ruling on summary judgment motions."[64]

Movants have not pointed to any of the nine motions that turns on whether plaintiffs' evidence is less than clear and convincing. My resolution of the motions turns on the legal consequences of the term sheet and other documents the authenticity of which is uncontested for purposes of summary judgment.

I will deny motion 9.

## V.    Conclusion

I will prepare an order denying the three summary-judgment motions, so no order need be lodged.

###

---

[64] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).